UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | No. 25-mj-203 |
| | : | |
| **PIERRE BLACK,** | : | |
| | : | |
| Defendant | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request to detain Defendant Pierre Black pending the resolution of this case pursuant to 18 U.S.C. § 3142(f)(1)(C) (drug offense with a maximum sentence of 10 years or more) and § 3142(f)(1)(D) (recidivist). In support, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

### BACKGROUND AND STATEMENT OF FACTS

The Defendant has been charged with Distribution and Possession with Intent to Distribute 40 Grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi). Specifically, in around February 2025, the Metropolitan Police Department's Violent Crime Suppression Division Overdose Section, along with the Drug Enforcement Agency, began investigating sales of controlled substances in the 700 block of H Street Northeast, Washington, D.C., 20002, following a suspected fatal fentanyl overdose that occurred in the area.[1]

During the investigation, law enforcement developed evidence that the Defendant was

---

[1] At this time, the Government is not alleging that the Defendant was responsible for this fatal overdose.

1

selling narcotics from inside of a store in the 700 block of H Street, Northeast, Washington, D.C. Law enforcement conducted multiple controlled purchases of drugs from the Defendant using an undercover officer (UC). These UC buys are reflected in the following chart:

| Date | Weight | Drugs |
|---|---|---|
| May 29, 2025 | 2.85 grams (lab weight) | Fentanyl, heroin, fentanyl analogue |
| June 12, 2025 | 3.70 grams (lab weight) | Fentanyl, heroin |
| June 24, 2025 | 5.58 grams (lab weight) | Fentanyl, heroin |
| July 1, 2025 | 28.15 grams (lab weight) | Fentanyl |
| July 15, 2025 | 30.88 grams (lab weight) | Fentanyl, heroin |
| July 28, 2025 | 53.90 grams (lab weight) | Fentanyl, heroin |
| August 21, 2025 | 57.1 grams (package weight) | Pending |

With respect to the charged buy, on July 27, 2025, the UC contacted the Defendant at a phone number the Defendant used (but which is registered to someone else) to arrange for the purchase of fentanyl. A female answered the phone and stated words to the effect of "he in the store," apparently referencing the Defendant. The undercover asked that Defendant contact the undercover. The Defendant did so and stated to the undercover words to the effect of, "he got something real nice," in apparent reference to his supplier. During that call and a subsequent call, the undercover and the Defendant arranged for a two-ounce purchase of fentanyl for $4,000 the next day.

On July 28, 2025, the undercover contacted the Defendant at the aforementioned phone number and a female answered again. The unknown female stated words to the effect of, "he can hear you" to the undercover. The undercover then confirmed with the Defendant, who was apparently on speakerphone, that they were meeting for the transaction.

Later that day, the UC and other law enforcement officers and agents went to the predetermined buy location in Northwest, Washington, D.C. The Defendant contacted the UC and reported he was five minutes away. At about 8:41 a.m., a black Jeep that the Defendant had

previously observed driving (but which is registered to someone else) arrived and parked next to a building. Standing outside the front passenger window, the undercover reached past a female passenger and handed the Defendant $4,300 in U.S. currency; $4,000 for the instant purchase, and $300 for a previous purchase that was still owed to the Defendant. In return, the Defendant handed the undercover a clear plastic bag containing two knotted plastic bags, each containing a tan powdery substance. The following photo shows the Defendant in the vehicle, while the photo below that shows the drugs that he gave the UC:





The final purchase between the UC and the Defendant occurred on August 21, 2025. The day before, the two arranged another sale of drugs via phone. The next day, they again met at the predetermined spot, where the Defendant—again in his Jeep, but without any other occupants—sold the Defendant approximately two ounces of suspected drugs. The following photos show the Defendant in the vehicle, the drugs in the UC's hand, and the suspected drugs:







On September 5, 2025, the Defendant was arrested on the instant complaint, and his residence was searched. Also present at the residence during his arrest were a female and juvenile.

Law enforcement found, among other things, a firearm with no chambered round and 9 rounds in a 10-round magazine within a safe in a bedroom closet. On top of the safe, they found a plastic bag containing a tan powder consistent in appearance with what had been sold to the UC (who ordered another two ounces before the search), though it was not field tested. Also found in the residence were other powders (possible drugs or cutting agents) and other drug paraphernalia. A picture of the firearm is below:



### APPLICABLE LAW

The Bail Reform Act requires pretrial detention where a court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Here, the Defendant is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(C) (drug offense with a maximum sentence of 10 years or more). He is also subject to detention pursuant to and § 3142(f)(1)(D) (recidivist) because he has at least two prior drug convictions carrying a sentence of more than ten years.[2] The

---

[2] For example, the Defendant was convicted in 2009-CF2-1465 of Possession with Intent to Distribute Heroin, a D.C. Code Schedule I controlled substance, which carries a maximum of 30 years of incarceration. *See* D.C. Code §§ 48-902.04(2)(K) (2000); 48-904.01(a)(2)(A) (2001). He was convicted in 1991-FEL-8395 of Distribution of Cocaine, a D.C. Code Schedule II controlled substance, which carries a maximum of 30 years of incarceration. *See* D.C. Code §§ 48-902.06(1)(D) (1990); 48-904.01(a)(2)(A) (1990).

Government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988)). At a detention hearing, the Government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

Here, because the Defendant has been charged with a drug offense carrying a maximum punishment of ten years or more, there is a rebuttable presumption in favor of detention under § 3142(e)(3)(A). The D.C. Circuit has observed that the rebuttable presumption covering serious drug trafficking offenses was included because of the "significant risk of pretrial recidivism" among persons charged with such crimes. *United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (citing S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203)). When the rebuttable presumption of Title 18, United States Code, Section 3142(e) is triggered, it operates "at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *Id.* at 371.

In considering whether there are conditions of release that will reasonably assure the safety of any other person and the community and the appearance of the Defendant as required, the Court must consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the Defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. 3142(g). In light of these factors, the United States respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community.

**ARGUMENT**

I.  **Nature and Circumstances of the Offense Charged**

The United States respectfully submits that the nature and circumstances of the charged offense weigh in favor of detention. The Defendant's conduct occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA, fentanyl "is similar to morphine but about 100 times more potent [. . . .] Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction [. . . .]" *See* DEA, Facts about Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl. Startlingly, "two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *Id.* The lethality of fentanyl is reflected in nationwide statistics: roughly 79,526 people in this country died of drug overdoses in the 12-month period ending in December 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of May 4, 2025).[3] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[4] And, thanks in part to people like the Defendant, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug*

---

[3] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[4] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

*Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[5]

But the Defendant was also involved with another serious danger—firearms. As the Court is well aware, our community has recently faced staggering levels of gun violence. D.C. saw 274 homicides in 2023, the highest in more than two decades. *See* MPD, *District Crime Data at a Glance*.[6] About 84 percent of the 203 homicides in 2022 involved the use of a firearm. *See* MPD, *Annual Report 2022*, 17.[7] But possessing firearms during or in connection with drug trafficking offenses—as it appears the Defendant did here, as evidenced by the fact that the gun was found in a safe on top of which drugs were located—poses increased danger in light of the extent to which drug trafficking can trigger violence. *Compare Smith v. United States*, 508 U.S. 223, 240 (1993) (noting that "drugs and guns are a dangerous combination"). This factor weighs heavily in favor of detention.

## II.    Weight of the Evidence Against the Defendants

The United States respectfully submits that the weight of the evidence against the Defendant also weighs in favor of detention. The Defendant engaged in recorded sales to a UC on multiple occasions out of a Jeep that he was known to drive. The July 28, 2025, sale was well over the 40-gram quantity charged in the complaint and which triggers the five-year mandatory minimum penalty, and it appears that the August 21, 2025, sale and the evidence seized during takedown will provide additional independent bases to charge the Defendant with a five-year mandatory minimum. The weight of the evidence is strong and, therefore, weighs in favor of detention.

---

[5] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.
[6] https://mpdc.dc.gov/page/district-crime-data-glance (last visited May 18, 2024).
[7] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR_2022_lowres.pdf.

**III.   History and Characteristics of the Defendant**

The United States respectfully submits that the Defendant's history and characteristics also weighs in favor of detention. The Defendant has *five* prior drug convictions between 1987 and 2017—four of which were felonies. Despite the age of his convictions, the Defendant appears to have five Criminal History Points, placing him in Criminal History Category III under the U.S. Sentencing Guidelines. This high category only underscores his extensive criminal background. The Defendant's criminal history weighs in favor of detention.

**IV.   Danger to the Community and Risk of Flight**

The Government respectfully submits that the Defendant poses a significant danger to the community as demonstrated by his conduct in this case involving fentanyl and a firearm. This danger is only underscored by the fact that, time and again, he has chosen to engage in drug trafficking even after getting caught. His repeated recidivism—which is exactly why there is a rebuttable presumption in favor of detention in this case—inevitably leads to the conclusion that that the Defendant would not stay out of trouble were he to be released. As such, he should be detained.

## CONCLUSION

For the reasons noted above, the Government respectfully submits that no condition or combination of conditions will mitigate the Defendant's danger.  Accordingly, the Government respectfully requests that the Defendant be detained.

    Respectfully submitted,

    JEANINE FERRIS PIRRO
    UNITED STATES ATTORNEY

By:   */s/ Solomon S. Eppel*
    SOLOMON S. EPPEL

                                            Assistant United States Attorney
                                            District of Columbia
                                            D.C. Bar No. 1046323
                                            601 D Street, NW
                                            Washington, DC 20530
                                            solomon.eppel@usdoj.gov